Complainant's bill seeks a construction and certain instructions with respect to the will of Edmund E. Read, Jr., who died August 7th, 1923, leaving his will dated January 7th, 1923, duly admitted to probate by the surrogate of Camden county on August 20th, 1923, in which he appointed the Camden Safe Deposit and Trust Company (now Camden Trust Company) executor thereof, and to whom letters testamentary were granted. The will made a specific bequest of certain personal belongings and furniture to testator's son, John S. Read, and gave certain directions as to the burial of testator, and then provided that:
"All the rest, residue and remainder of my estate, real and personal, I give, devise and bequeath to the Camden Safe Deposit and Trust Company, in trust nevertheless, for the following uses and purposes:
"To pay to my said son as soon as may be after my decease the sum of One Thousand Dollars.
"To collect the rents, issues and profits thereof and after paying the necessary expenses of the trust, to pay the net income thereof to my son, John S. Read, in monthly installments as far as practicable, so long as he shall live, and I hereby authorize and empower the said Camden Safe Deposit and Trust Company to sell any and all of the real estate of which I may die seized, and to change any of the investments which I may have made in my lifetime, with full power to reinvest the same in such securities as they in their judgment deem best without regard to investment of the same in those securities which are legal for trust estates."
He further provided:
"I further direct and empower the said Trust Company, if at any time it shall become necessary owing to bad health or accident to my said son, to use so much of the said principal as they may deem necessary for his medical care and comfort during said sickness and convalescence." *Page 601 
It is the latter paragraph to which our attention is directed for the purpose of determining the scope of the authority of the trustee respecting the use of the principal of the estate for the purposes mentioned.
The will further provided that upon the death of testator's son, John S. Read, leaving a widow and no children surviving him, that said trust should be continued for the benefit of such widow as long as she should live and remain his widow, provided she be in being at the time of the death of the testator, otherwise for the term of twenty years after the death of his said son; that if the said son, John S. Read, should die leaving a widow and children surviving him, then to continue said trust for the benefit of his widow as aforesaid and for his children equally, share and share alike, until the youngest shall have arrived at the age of twenty-one years, when the principal is to be divided among said children, share and share alike; and that in the event that the said John S. Read should die leaving no children surviving, or that all said children should die before they reached the age of twenty-one years, then subject to the devise to the widow, if any, as aforesaid, the sum of $10,000 in trust for the use of Saint Paul's Church, Camden, New Jersey; and the remainder of the said estate to testator's niece, Mary Coffin, and to his nephew, William T. Read, in equal shares; and if either or both of them should die before testator, their children to take the share their father or mother would have taken if he or she had been living. Testator made directions for the burial of his son, the said John S. Read, in like manner as for himself, and for the erection of a similar cradle over his grave.
John S. Read, William T. Read and Mary Coffin, all of whom survived the testator, are parties defendant in this cause. William T. Read and Mary Coffin are half first cousins of John S. Read.
In lieu of the filing of an account by the complainant trustee, it was stipulated under date of December 21st, 1937, for the purpose of the proceedings herein, that a summary thereof appended to the stipulation should be accepted as a true and correct statement of the figures therein set forth. It appears by this stipulation that the amount of principal, *Page 602 
as per the first and final account of said executor, is $145,904.52; that the present book value of the principal is $160,384.05; and that the present market value of the principal is $141,223.01. There is, in addition, certain real estate consisting of the Read homestead property at 604 Cooper street, Camden, New Jersey, and the lot adjoining on the rear and having a frontage of twenty feet on Broadway. It further appears that the total gross income from the estate so held in trust, from 1924 to 1937, inclusive, was $114,742.49, and that there had been paid in taxes out of the income, from February, 1925, to date, covering premises 604 Cooper street and lot adjoining in the rear, the sum of $38,299.24. The taxes for the year of the testator's death on these premises were $688.18, and for the year 1936, the sum of $3,348.62; and for 1937, after a deduction by a tax appeal, a net sum of $2,866.24. The trustee, under the authority of the quoted paragraph of the will relating to the medical care of John S. Read, has expended an aggregate sum of $7,710.19; and from the income, the trustee has expended for repairs on 604 Cooper street the sum of $953.72, and has erected a garage on that part of the premises facing on Broadway at an expense of $2,061.05. After testator's death, North Broadway, Camden, was opened and certain assessments made which, together with certain arrearages of taxes, were paid out of the principal of the estate, amounting, in the aggregate, to $11,413.64.
John S. Read is the only child of testator. He was born November 11th, 1883, and has never married. In 1936 he made application to complainant for an advance of $1,500 out of the principal of the estate so that he might spend the balance of the winter of that year and the early spring of the following year in the tropics, upon the advice of his personal physician, Dr. Prout, that it would be of benefit to his health because of his serious physical ailments. The remaindermen under the will, Mary Coffin and William T. Read, objected to such payment being made from the principal of the estate and thereafter the trustee filed this bill seeking instructions as to whether that amount, or any amount, should be paid to testator's son out of the principal, and, if so, under what conditions. Defendant John S. Read answered the bill *Page 603 
admitting its allegations and seeking an order directing such payment. The defendants Mary Coffin and William T. Read urge by their answer that such payment is not necessary and is not authorized under the terms of the will, and in their counter-claim ask that the complainant be ordered to sell or lease the real estate known as 604 Cooper street, Camden, New Jersey, with the lot adjoining same in the rear, so that the income from the investment of the proceeds of such sale should increase the estate's income.
It will be noted that the testator directed that the whole net income from his estate held in trust should be paid to his son, John S. Read, in monthly installments as far as practicable during his lifetime, and then added the provision directing and empowering the Trust Company, if at any time it should become necessary, owing to bad health or accident to said son, to use so much of said principal as might be deemed necessary for his medical care and comfort during said sickness and convalescence. It is contended on behalf of defendants Mary Coffin and William T. Read that the testator meant that such use should be made only in case the income is insufficient. On the other hand, it is argued by counsel for John S. Read that the direction and power to use the principal under such conditions is absolute, whether the income directed to be paid to John S. Read is sufficient or not for such purposes.
As I read the will in its entirety and take into consideration the circumstances which apparently led testator to make this provision, I have concluded that the trustee is empowered to use principal should John S. Read be in bad health or suffer an accident. "Necessary" as used first in that paragraph of the will relates to those two contingencies, bad health or accident, and is not dependent upon the amount of income to which John S. Read is entitled or receives under the preceding paragraph of the will. But only so much of the principal shall be used as the trustee deems necessary for "medical care and comfort during said sickness and convalescence." This seems to have been the construction placed upon the will by the trustee, because of the fact that covering a period beginning in 1926 and continuing on through to the *Page 604 
date of the hearing of this cause, there has been paid out of principal approximately $7,700 for medical expenses, which seemed to have been justified because of bad health of John S. Read. One item, $528 in 1935, was to reimburse John S. Read for his expenses to Florida.
The court is now asked to determine from the evidence which has been produced whether the trustee is justified in paying the expenses incurred in a trip to Florida in 1937, taken upon the advice of Dr. Prout, and for which Mr. Read borrowed the money, and to authorize the trustee to expend a sum each year so that Mr. Read may spend his winters in the tropics.
It is not seriously disputed on behalf of defendants Mary Coffin and William T. Read that John S. Read is suffering and has suffered from bad health.
In 1908 he had a complete nervous breakdown, for which he had treatment in the sanitorium of Dr. Thomas P. Prout at Summit, New Jersey, where he remained for about two years, during which time he had surgical treatments on his nose because of a frontal sinus condition. Afterwards he had three other operations on his nose and throat. In 1922 he developed diabetes and after consulting Dr. Prout he was sent to the sanitorium of Dr. Allen at Morristown, New Jersey, who treated him. His diabetic condition continued and he still suffers from that disease and receives treatment therefor. In 1928 Dr. Paul Mecray performed a surgical operation removing his gall bladder and appendix, and at that time he was confined at the Cooper Hospital in Camden for seven weeks. Mr. Read about that time consulted Dr. Fraley, who had charge of his case for some time and who prescribed insulin for him which he has taken ever since. After he had left the hospital in 1928, he had difficulty in walking, because of severe pains in the legs. These pains, he says, have continued ever since when he stands for any length of time, and particularly when he walks. At the suggestion of Dr. Fraley he was treated by Dr. Buzby, who gave him diathermic treatments and who diagnosed his ailment as arteriosclerosis in the legs. Dr. Prout had diagnosed Mr. Read's disease so far as his legs were concerned, as Buerger's disease, but it seems *Page 605 
quite probable that Dr. Buzby was correct in his diagnosis; at least I feel so because of the wide experience Dr. Buzby has had as an orthopedic surgeon; however, I do not think it necessary to dwell on what is the proper form of treatment Mr. Read should receive under his situation as I view it.
In July of 1933, while Mr. Read was in Maine, he suffered a more severe attack and consulted a Dr. Prithen. This attack was so serious that amputation of one leg was considered; instead, however, he returned to Dr. Prout's sanitorium for about three weeks for diathermic treatments. After his return to his home in Camden, Mr. Read received intermittent treatments of the same kind.
It appears from his testimony that he was advised by Dr. Prout that he would be benefited by spending the cold weather in the south where the sunshine and warmth would be very helpful to him. Mr. Read said that he found that his legs were better in warmer weather, and he was benefited in a warm climate. Mr. Read, upon the failure of the trustee to advance this money, borrowed some money with which to make the trip.
After taking into consideration the testimony concerning Mr. Read's condition, showing beyond all question a chronic condition of bad health, I feel that the provisions made for him under such conditions are such as to justify the trustee in considering, in addition to actual medical care, the question of his comfort during his sickness and convalescence, and such amounts as the trustee may deem necessary for such purposes are properly chargeable against the said principal. The testator's intention, gathered from the language of the will, was to provide for his son not only medical care arising because of bad health, but also comfort during his sickness and convalescence.
The trustee seeks to impose upon the court the fixing of such amount. There seems to be no occasion for the court to do so under the construction which is now placed upon the testator's will. The duty rests upon the trustee to ascertain and determine what amount is necessary to be expended for Mr. Read's medical care, comfort and convalescence, including a reasonable and sensible amount for expenses to *Page 606 
the south during our cold months, taking into consideration Mr. Read's station in life, and the increase or decrease of the severity of his ailment. This son was the object of testator's special testamentary care and provision, and the conclusions here reached seem to be clearly indicated by the circumstances of this case.
As to the counter-claim filed by the defendants Mary Coffin and William T. Read, in which they seek to require the trustee to proceed to sell the property now occupied by the life tenant so that his income may be increased to such an extent that he could well pay for his medical care in case of sickness, it seems to me that the only question that I should now determine is whether the trustee, under the conditions which exist at this time, should be directed to sell this real estate.
Mr. Chalmers, a real estate broker engaged in business in and about Camden for many years, and admitted by counsel for the defendants Mary Coffin and William T. Read to be the best real estate expert in Camden, and conceded to have had a long and wide experience, testified concerning the possibility of a sale or lease of the Read property at 604 Cooper street and the strip of land in the rear having a frontage of twenty feet on Broadway. He, or the real estate company with which he is connected, had been working on the matter for at least ten years, and during that period only one proposition had been submitted and that related to leasing the property facing on Broadway for a restaurant. This proposition has been submitted by the trustee to John Read, and because of his desire to continue to reside in the homestead, and for fear that a lease would result in some annoyance to him, and for other reasons, he objected to the lease, which was a long-term lease containing an option to purchase, and nothing was done. It appears from the testimony that all the real estate in question is assessed at approximately $66,000 for the year 1937, and that in the opinion of Mr. Chalmers it would not be possible to sell the property for that amount under the conditions as they exist. In his opinion, he said, the land at 604 Cooper street, had a justified value of $40,000 and the Broadway property a justified value of $20,000, a *Page 607 
total of $60,000, which was its approximate tax assessment. He stated that if it were necessary to dispose of the property within the next thirty or sixty days, referring to the date of the hearing, he did not believe it would bring over $10,000 or $12,000 for the Broadway lot, and perhaps $20,000 to $25,000 for the Cooper street lot. In other words, $35,000 under a forced liquidation would be all that could be gotten; and that so far as leasing the property for a parking lot is concerned, it would not bring over $1,200 a year, or at the most $1,500, and this after the buildings on the property were demolished.
The conditions of the real estate market are such that any sale made of this real estate at this time would be at a great sacrifice; and certainly it would not be to the benefit of the estate to have a sale made at this time. The testator's will empowers the trustee to sell the real estate, and from the testimony of John S. Read, it appears that efforts have been made to do so during the past two years. Further than to say that there is nothing in the evidence which would lead the court to instruct the trustee to make a sale of this real estate at this time, I have concluded that the matter should be left, as in the will, to the sound discretion of the trustee to make a sale when it appears to the trustee to be to the advantage of the estate.
John Read owns a great deal of furniture among which are valuable antiques, and, as he testified, he was born in this Cooper street house, his father lived there before him, and he wants to continue to reside in the property even at the sacrifice of some financial benefit to him in the way of income should the property be sold.
Without discussing further what might have been done with the property at a time when the real estate market was active, and to an extent speculative, largely due to the opening of the Delaware river bridge, consideration must be given to conditions as they now exist; therefore my views with respect to this property.
A decree will be advised in accordance with these conclusions. *Page 608